UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


KAREN ELAINE CARPENTER )
                                              )
v.                                            )              NO. 2:09-CV-140
                                              )
CITY OF BEAN STATION, TENNESSEE,  )
*ET AL.*                                     )


## <u>MEMORANDUM</u>

### I. OVERVIEW

On January 23, 2009, a warrant was outstanding for plaintiff's arrest on charges of manufacturing methamphetamine. Chief Andy Dossett of the Bean Station Police Department spotted plaintiff's vehicle, and he attempted to have her stop. Plaintiff chose to flee. She was pursued by Andy Dossett and then by Ben Dossett, another Bean Station Police Officer. After a high-speed late night vehicle chase along dark, narrow roads of Grainger and Hawkins Counties, plaintiff ran her vehicle into the ditch line alongside the road, rendering it immobile, at least temporarily. After exiting their cars, and screaming at plaintiff to stop her efforts to get out of the ditch, the two Bean Station police officers fired a fusillade of shots. Some of the shots struck plaintiff in the face and head, necessitating the removal of both her eyes.

Pursuant to 42 U.S.C. § 1983, plaintiff has sued the two officers in their individual capacities, contending that their shooting of her constituted excessive force and therefore was

a violation of her right to be free of unreasonable seizure under the Fourth Amendment to the Constitution. Also, again based on the officers' alleged use of excessive force, she claims that she was denied her substantive due process rights under the Fourteenth Amendment.

Lastly, with respect to her suit against the two police officers, she asserts state law claims based on outrageous conduct and assault and battery.

With respect to the defendant municipality, plaintiff alleges that Bean Station manifested deliberate indifference to her constitutional rights by failing to adequately train its police officers.

The defendant municipality has filed a motion for summary judgment, (Doc. 20), arguing that plaintiff's suit against it should be dismissed (1) because it is barred by the doctrine enunciated in *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) because (a) there was no constitutional violation in the first place, and (b) plaintiff has no proof that Bean Station failed to adequately train its officers; and (3) plaintiff has no claim under the Fourteenth Amendment inasmuch as her suit is premised solely on the officers' use of excessive force.

The two officers, Andy Dossett and Ben Dossett, also have filed a motion for summary judgment, (Doc. 22). They argue that they are entitled to summary judgment because (1) plaintiff's claim is barred under the *Heck v. Humphrey* doctrine; (2) the force utilized by the officers was reasonable as a matter of law; (3) plaintiff has no cognizable claim under the Fourteenth Amendment; and (4) the two officers are entitled to qualified immunity. The officers also ask that plaintiff's state law claims be dismissed if all the underlying federal claims are dismissed; and because the undisputed facts show that neither

2

of these defendants acted intentionally, recklessly, or in a manner that cannot be tolerated by civilized society.

For her part, the plaintiff has filed a motion to "deny or defer" the defendants' respective motions for summary judgment, (Docs. 43 and 46).

The plaintiff's motions, Documents 43 and 46, have been referred to the magistrate judge for disposition. *See*, Order, Doc. 50. Also, the defendants' motions for summary judgment, Documents 20 and 22, have been referred to the magistrate judge for his recommended disposition; *see*, Order, Doc. 53. The various motions were argued on October 13, 2011.

## II. SUMMARY JUDGMENT PRINCIPLES

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a

3

showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* A genuine issue for trial is not established by evidence that is "merely colorable," or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.

Before ruling upon a motion for summary judgment, the non-moving party must be afforded a reasonable opportunity for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

4

(1986); *Plott v. Gen. Motors Corp.*, 71 F.3d 1190 at 1195 (6th Cir. 1995) ("Before ruling on summary judgment motions, a district judge must afford the parties adequate time for discovery, in light of the circumstances of the case.")

The affirmative defense of qualified immunity in a § 1983 case presents a relatively unique problem as far as summary judgment and any antecedent discovery is concerned: "The purpose of a qualified immunity defense is not only protection from civil damages but protection from the rigors of litigation itself, including the potential disruptiveness of discovery." *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004). When a motion based on qualified immunity is filed, the district court is not allowed the luxury of denying or postponing a ruling on it merely because discovery is not complete. *Id.* On the other hand, if the motion for qualified immunity is based on facts which the non-movant can demonstrate is in dispute, summary judgment based on qualified immunity is precluded and discovery must proceed. In other words, when ruling on a motion based on qualified immunity, all disputed facts must be resolved in favor of the non-moving plaintiff. *Scott v. Harris*, 550 U.S. 372, 377 (2007) ("In resolving questions of qualified immunity, courts are required to resolve a 'threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.'"

## III.   PLAINTIFF'S MOTION TO DENY OR DEFER RULING ON BEAN STATION'S MOTION FOR SUMMARY JUDGMENT AND BEAN STATION'S MOTION FOR SUMMARY JUDGMENT

In order to establish liability against Bean Station, the plaintiff must prove (1) that her

5

constitutional rights were violated and (2) that the violation of those constitutional rights flowed from the implementation or execution of a policy, custom, or practice of the City of Bean Station. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). If Bean Station is to be held liable under § 1983, it must have been guilty of some act or omission that amounts to deliberate indifference to the rights of the plaintiff. *Id*. The City cannot be liable on the basis of *respondeat superior*; the City can be liable only for *its* actions, manifested by some municipal "custom or policy." *Id.* A "failure to train," or inadequate training, will support a claim of liability under § 1983, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the policy come into contact." *City of Canton v. Harris*, 489 U.S. 378 (1989).

Bean Station relies upon the affidavit of its Chief of Police, the defendant Andy Dossett, in which he states:

> At the time of the incident in question, January 23, 2009, Ben Dossett and I were certified law enforcement officers in the state of Tennessee. As the Chief of Police, I have personal knowledge that both he and I had all of our required training to be certified by the state of Tennessee. This includes all training regarding use of force and use of firearms. Further, at all times relevant we completed all in-service training required by the state of Tennessee.[1]

As matters now stand, this affidavit is uncontradicted, but therein is the rub: plaintiff complains that she has not been given an opportunity to depose either of the defendants Dossett, or any official representative of the City of Bean Station, e.g., the Mayor, and she should be given this opportunity.

---

[1]Doc. 23, ¶ 24.

6

There are two distinct, but nevertheless related, considerations. First, Andy Dossett has made a factual assertion in his affidavit, *viz.*, that he and his co-defendant were "certified law enforcement officers" in the state of Tennessee, and had received all required training to be so certified. That factual assertion remains untested, and the discovery deadline has not yet expired. Plaintiff should be allowed an opportunity to cross examine Andy Dossett in a discovery deposition to test the validity of those factual assertions. Similarly, the plaintiff should be afforded a reasonable opportunity to take the deposition of an appropriate official of the City of Bean Station – presumably the Mayor – to test the accuracy of Andy Dossett's assertion in his affidavit.

The second consideration is somewhat more complicated. If Andy and Ben Dossett indeed were certified by the state of Tennessee, then as a matter of law the training received by Andy Dossett and Ben Dossett was adequate. In 1981, Tennessee legislature created the Peace Officers Standard Training ("POST") Commission, Tenn. Code Ann. § 38-8-101, *et. seq.* That Commission was and is charged with the responsibility of developing, planning, and implementing law enforcement training programs for all local law enforcement officers in the state of Tennessee.[2] Further, the Commission is required to establish unified standards for the employment and training of police officers, and to establish minimum standards and curriculum requirements offered by any political subdivision or agency for the purpose of

---

[2]38-8-104.

training police recruits or officers.[3]  The minimum standards for police officers established by the Commission are binding on all governmental entities.[4]  The Commission issues a certificate of compliance to any person "who meets the qualifications for employment and satisfactorily completes an approved recruit training program."[5]

If the two defendant police officers were certified by the POST Commission, then the issue of the adequacy *vel non* of their training is resolved.  If the training was inadequate, then it necessarily follows that the standards established by the POST Commission was inadequate or, alternatively, that the facility at which these officers received their training, approved by the POST Commission, provided inadequate education and training, which again necessarily implicates the inadequacy of the POST Commission's requirements for training police officers in this state.

If it be assumed for the sake of discussion that the POST Commission's minimum requirements were deficient in some particular, or that a Commission-approved training facility rendered inadequate instruction notwithstanding that it was a facility approved by the Commission, either circumstance could not make the City of Bean Station liable.  The POST Commission is the agency charged by the Tennessee legislature with establishing approved facilities for the training of all police officers in this state.  If the POST Commission itself is derelict in its responsibilities in that regard, or if one of its approved facilities fails to fulfill

---

[3] *Id.*

[4] 38-8-105.

[5] 38-8-107(a).

8

its teaching responsibilities, how is the City to know? Where would any political subdivision of this state go to have its police officers trained? The answer is nowhere. What would the Mayor of Bean Station know beyond what the POST Commission knows? The answer is, nothing.

*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992) does not dictate a contrary result. In *Russo*, the city itself created the training program, 953 F.2d at 1046. Here, if the training was deficient, the "creator" of the training regimen is the POST Commission, not the city. In a real sense, the legal issue is whether reliance by a city on a state-mandated training and certification system for police officers constitutes a policy or custom that amounts to "deliberate indifference." It cannot.

Thus, if discovery does not call into dispute that these two defendant officers received training at a Tennessee POST Commission-approved facility and that they indeed were certified by the POST Commission as law enforcement officers in Tennessee pursuant to the statute, then the City should be dismissed from this case.

## IV. OFFICERS' MOTIONS FOR SUMMARY JUDGMENT; PLAINTIFF'S MOTION TO DENY OR DEFER RULING ON DEFENDANTS' MOTION

### *HECK V. HUMPHREY DOCTRINE*

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a plaintiff could not maintain a § 1983 claim for an unlawful and arbitrary investigation that led to his arrest if the proof necessary to uphold his suit would amount to a *de facto* invalidation of the

plaintiff's underlying criminal conviction. 512 U.S. at 486-87. In this case, the plaintiff was convicted of evading arrest which obviously was based upon her high-speed flight from the two Bean Station officers.[6] Of course, there is nothing facially inconsistent between the plaintiff's evasion of the officers' attempted arrest of her and a claim that those officers used excessive force during the arrest. The defendants attempt to close this logical loophole by relying upon *Roberts v. Anderson*, 207 WL 79057 (6th Cir. 2007) for the proposition that "an officer's excessive use of force is a defense to a charge of resisting or evading arrest; . . . [and therefore] a guilty plea and resultant conviction of [evading arrest] necessarily includes a finding that the officer did not use excessive force."[7] The defendants Dossett argue that plaintiff did not avail herself of the opportunity to claim that the officers used excessive force against her as a defense to the charge of evading arrest.

The defendants' reasoning is innovative, but faulty. First, to state the obvious, an unlawful flight to avoid arrest, no matter how egregious, does not justify the officers' subsequent use of excessive force. And as far as *Roberts, supra*, is concerned, the fallacy of defendants' argument is apparent if one analyzes what would have happened had the plaintiff attempted to rely upon the officers' use of excessive force in defending the charge against her for evading arrest. The short answer is, it would have been completely ineffective. Plaintiff had been "evading arrest" for many minutes, long before the officers allegedly used any excessive force upon her. Plaintiff's evasion of arrest, and the officers' alleged

---

[6]Doc. 22-2.

[7]*Roberts*, at * 6.

10

excessive force, were two distinct and independent events. The officers' use of excessive force, if such occurred, in no way vitiated or excused the plaintiff's preceding evasion of arrest, and any attempted reliance upon the officers' excessive force in defense to the charge of evading arrest would have been an utter futility. By the same token, plaintiff's attempted evasion of arrest, *once ended*, was no justification for the use of deadly force.

The doctrine of *Heck v. Humphrey* has no application to this case since a finding that the officers used excessive force in effecting her arrest in no way amounts to a *de facto* invalidation of her underlying conviction for evading arrest.

### *WAS THE OFFICERS' USE OF DEADLY FORCE REASONABLE AS A MATTER OF LAW?*

The Supreme Court has held that

> [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [Citation omitted.] With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment context, however, the "reason-ableness" inquiry in an excessive force case is an objective one: The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [Citations omitted.] An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. [Citations omitted.]

*Graham v. Connor*, 490 U.S. 386, 396 (1989).

In determining whether an officer's use of force was reasonable, the court must take into account three factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Livermore v. Lubelan*, 476 F.3d 397, 402 (6th Cir. 2007), citing *Graham v. Connor*, 490 U.S. 386, 396-99.

Plaintiff's antecedent actions in fleeing the officers at a high rate of speed endangered innocent bystanders, as well as these officers. It is nothing short of miraculous that the plaintiff did not crash head-on into any other vehicles on the dark, narrow roads. In an effort to stop her flight, these officers arguably would have been justified in using deadly force to stop her vehicle; *see, e.g., Scott v. Harris*, 550 U.S. 372, 385-86 (2007). But here, the high-speed chase had come to an end when plaintiff lost control of her truck and ran off the road to the left.

When plaintiff's truck left the roadway, a new situation arose, although that new circumstance could not be completely divorced from what had transpired earlier, i.e., plaintiff's high-speed and incredibly dangerous flight. The affidavits of the two officers and plaintiff have been read, as well as the relevant excerpts from the plaintiff's discovery deposition. However, if a picture is worth a thousand words, then a video recording is worth a million. The entire automobile chase and its violent ending was recorded, audibly and visually, on Andy Dossett's in-car camera. To the extent that the recording contradicts any of the parties' affidavits, or to the extent reasonable inferences can be drawn from the

12

recording that contradicts a factual assertion in any affidavit, the recording must control.[8]

In her affidavit,[9] plaintiff suggests that after she ran her truck off the road and into the ditch, she ceased all efforts to escape. She unequivocally asserts that she recognized Andy Dossett, and she told him immediately "not to shoot." She says that she saw Andy shoot at her, and she did not recall seeing Ben Dossett at all. Similarly, in her deposition,[10] she maintains that she was no longer trying to escape after she ran into the ditch, and that she had no recollection of "revving" her engine.

In his affidavit,[11] Andy Dossett says he pulled up alongside plaintiff's truck; that he got out of his car and drew his weapon; that he ordered plaintiff to get out of her vehicle, and

---

[8]A court is not required to accept a witness's testimony if that testimony is inconsistent with, or contradicted by undisputed physical facts. This is the so-called "physical facts rule." *See, Scott v. Harris*, 550 U.S. 372 (2007):

> When opposing parties tell two difference stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life, respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the video tape.

*See also, Harris v. Gen. Motors Corp.*, 201 F.3d 800, 803 (6th Cir. 2000).

[9]Doc. 43-2.

[10]Doc. 22-8.

[11]Doc. 23.

13

she never complied; that plaintiff's only reaction was to continue revving the engine and rocking her truck back and forth in a continuing attempt to escape. He goes on to recite that he moved toward the front passenger side of her car and yelled at plaintiff to stop, but she continued to rev the engine. He became fearful of getting pinned between plaintiff's truck and his vehicle if she suddenly came out of the ditch. He then observed Ben Dossett move in between Andy Dossett's patrol car and Carpenter's truck, giving rise to concern for Ben Dossett's safety. At this point, so Andy Dossett says in his affidavit, he decided to shoot the front passenger tire in an effort to disable plaintiff's truck. Notwithstanding his shots at the right front tire, plaintiff continued her effort to extricate her vehicle from the ditch, prompting Andy Dossett to shoot into the engine compartment in an effort to disable the truck. That too, proved unsuccessful. At this point, the truck lurched, prompting Andy Dossett to retreat and to fire a shot in the direction of the truck in a effort to "defend myself and officer Ben Dossett." He then states that, "to my knowledge, none of the bullets I fired that night made any contact with the body of Ms. Carpenter."

In his affidavit,[12] Ben Dossett says he ran up to the passenger side of plaintiff's truck, thereby placing himself between Andy Dossett's police car and the truck, in an attempt to break the passenger window of plaintiff's truck. He also describes how plaintiff obviously was attempting to get out of the ditch and continue her flight. Ben Dossett claims that when he saw the truck lurch forward, he believed that Andy Dossett was in danger of being struck,

---

[12]Doc. 24.

14

prompting him to fire two or three shots in an effort "to protect both Andy and myself from being possibly struck by the truck." He also states that he believed members of the public would have been in imminent danger if plaintiff managed to get back on the road and resume her flight. He flatly states in his affidavit that he fired his gun at Ms. Carpenter.

The recording[13] has been viewed, and re-viewed, many times. That recording of course shows the lengthy, late night and high speed chase of the plaintiff. But it is at 22:59:30 on the recording that the immediately relevant events are shown: plaintiff's vehicle is off the roadway to the left, in the ditch line, and parallel to the road. Andy Dossett stops *beside her*; not in front of her, not behind her, but directly beside her. For precisely ten seconds, nothing can be seen on the recording other than the roadway in front of the two vehicles, lit by the headlights. Presumably, during that ten seconds Andy Dossett is making his unsuccessful effort to open plaintiff's passenger door. Plaintiff clearly is continuing to accelerate her engine, but to no avail. Her assertion in her affidavit that she was no longer trying to escape is incorrect at best, and an outright lie at worst.

After ten seconds, Andy Dossett appears on camera with his gun drawn and aimed at the passenger compartment of the truck. Andy Dossett is yelling something, but the noise generated by his siren and plaintiff's screaming engine completely drowns out his voice. Within a matter of just a few seconds, he fires three shots at the front tire of plaintiff's vehicle. As he does so, Andy Dossett glances to his left, toward the rear of the vehicle,

---

[13]A DVD, filed as Exhibit 2 to the officers' motions for summary judgment.

presumably at Ben Dossett. As Andy Dossett fired his three shots at the tire, another shot can be heard, which obviously was fired by Ben Dossett. After firing his three shots, Andy Dossett raises his left hand and again glances to his left, clearly signaling to Ben Dossett to either stay back or back away. Due to the cacophony of the screeching engine and the sirens, it is difficult to tell for certain, but there are sounds on the recording consistent with Ben Dossett firing additional shots. Notwithstanding all the shots fired, plaintiff's engine continued to race. Andy Dossett then fired a series of rounds into the engine compartment, or so it appears. At 23:00:08, Andy Dossett is seen to suddenly walk backwards, then walk forward, and then backwards again. At 23:00:20, he all but runs backward, more or less firing his weapon wildly, at which time the recording captures a "lurch" of plaintiff's vehicle. It did not come out of the ditch line. Then, at 23:00:23, Andy Dossett again comes within camera range, with his weapon pointed at plaintiff's vehicle, although he fired no more shots. What obviously is Ben Dossett's arm appears at the same time, and Ben Dossett fires another shot. At 23:00:28, both officers disappear from the recording; Andy Dossett reappears at 23:00:41 as he runs up to the truck, obviously to look into it. He then runs somewhere behind his own car. At that point, it is all over.

A still photograph taken much later shows all the vehicles, including Ben Dossett's, as they were positioned during the shooting.[14] Andy Dossett's car is more or less directly beside plaintiff's truck, which is in the ditch line and slightly angled toward the roadway. The

---

[14]Ex. 3, to Doc. 20.

right front tire on the truck obviously is flat. Ben Dossett's vehicle is behind and to the right of Andy Dossett's vehicle.

As we all know, the use of deadly force to prevent the escape of a felony suspect who does not pose an immediate threat to the officer or anyone else is unconstitutional. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Nevertheless, if an officer has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or innocent bystanders, it is not unreasonable to prevent that suspect's escape by using deadly force. *Id*. As noted earlier in this memorandum, *Scott v. Harris* at least suggests that these officers could have constitutionally utilized potentially deadly force to bring the high speed chase to an end before plaintiff killed an innocent person. But plaintiff's high speed flight had come to an end, thanks to a fence and a ditch line. However, contrary to her affidavit, she was doing all that she could to continue her flight. These officers claim in their affidavits that they feared for their own safety, and the safety of others *if plaintiff was successful in getting her truck back onto the roadway.* Since she did not heed their instructions to cease her efforts in that regard, Andy Dossett shot at her tires, and then into her engine compartment, none of which had the desired result. Ben Dossett, by his own admission, fired at the plaintiff, and the only reasonable conclusion that can be drawn from that statement is that he intended to kill her.

These officers had probable cause to believe plaintiff was doing all that she could to escape and, if she did escape, another high speed chase would ensue, and the public, as well as the two pursuing officers, would be placed in deadly peril. But that does not end the inquiry, at least as far as summary judgment is concerned. Under *all* the circumstances, was

17

their use of deadly force objectively reasonable?

This court cannot fathom why Andy Dossett did not pull his police cruiser in front of the plaintiff's truck, thereby ending any chance that she could escape by going forward. Similarly, why Ben Dossett did not pull his cruiser directly behind the plaintiff to foreclose any possibility of her backing up in an effort to escape also screams for an answer. Even to one as untutored in police work as this magistrate judge, that seemed to be the obvious course of action. The officers cannot rationally argue that they did not do so for their safety since each of them, at one time or another, got directly beside the passenger door of the plaintiff's vehicle in an attempt to gain entry. Had the officers used their vehicles to block the plaintiff, they could have exited their cars, found a comfortable place to sit, and serenely waited for the plaintiff to run out of gasoline. As the recording plainly shows, Andy Dossett was extremely excited. Presumably, so was Ben Dossett. And, they undeniably were in a tense and quickly-evolving situation. But even taking these circumstances into account, their actions in shooting the plaintiff were not objectively reasonable under the totality of the circumstances, at least from the standpoint of a reasonably competent police officer confronting the same situation.

*QUALIFIED IMMUNITY*

> Qualified immunity in cases involving claims of deadly force is difficult to determine on summary judgment because liability turns upon the Fourth Amendment's reasonableness test. Under *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the police may not use deadly force against a citizen unless "the officer has probable cause to believe that the suspect poses a *903 significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. at 1697. The proper application of Fourth Amendment reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the

18

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989). This is an objective test, to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.,* and making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.* at 397, 109 S.Ct. at 1872. Thus, in a civil suit arising from the use of deadly force, the police "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have [shot the victim]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). The central legal question is whether a reasonably well-trained officer in the defendant's position would have known that shooting the victim was unreasonable in the circumstances. *Id.* at 345, 106 S.Ct. at 1098.

This Court has established that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force. When "the legal question ... is completely dependent upon which view of the facts is accepted by the jury," the District Court cannot grant a defendant police officer immunity from a deadly force claim. *Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir.1989). This is because the reasonableness of the use of force is the linchpin of the case. If the jury determines the officer shot the suspect without a reasonable belief that he posed a significant threat of death or serious physical injury to the officer or others, then the officer's actions were legally unreasonable under the Fourth Amendment. *Id.* at 216. On the other hand, if the jury believes the officer's version of the facts and finds the officer's conduct was reasonable, then he will be entitled to qualified immunity. *Id.* Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability. *See Buckner v. Kilgore,* 36 F.3d 536, 540 (6th Cir.1994); *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994); *Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir.1993); *Washington v. Newsom,* 977 F.2d 991, 995–96 (6th Cir.1992); *Yates v. City of Cleveland,* 941 F.2d 444, 447 (6th Cir.1991). This is especially true considering that the District Court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment. *See Dickerson v. McClellan,* 101 F.3d 1151, 1162 (6th Cir.1996); *Adams,* 31 F.3d at 384.

*Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902-3 (6th Cir. 1998).

19

In partial response to these defendants' motions for summary judgment, the plaintiff submitted the affidavit of Phillip L. Davidson, who perhaps may be the most qualified expert in excessive force cases ever seen by this magistrate judge in his sixteen years with the federal court. Davidson earned a Ph.D in higher education administration from Vanderbilt University and a law degree from the Nashville School of Law. He is a former police officer of the Metro Nashville-Davidson County Police Department, during which employment he was a patrol officer and zone commander. He also was assigned to the Police Academy where he taught, among other things, use of force by the police. In 1984, he was appointed by then-governor Lamar Alexander to become the Director of the Tennessee Law Enforcement Training Academy in Donelson, and head of the Peace Officers Standards and Training [POST] Commission. Throughout the years, he has taught courses at various institutions regarding SWAT tactics and police use of force.

Dr. Davidson is of the opinion that the two police officers "used excessive, unreasonable and unnecessary deadly force against Karen Carpenter."[15]

On a totally objective basis, it is obvious that no *reasonably competent* officer would have fired shots at the plaintiff as did these defendants, even under the tense circumstances they confronted. Further, this court is of the opinion that officers of "reasonable competence," *Sova, supra*, could not disagree with this conclusion. In this regard, it is noted that the only affidavits in the record filed on behalf of the two officers are their own. With respect to their

---

[15]Doc. 46-2, ¶ 4.

claims that they shot the plaintiff to prevent the resumption of her flight, it should be for the jury, not the judge, to determine if their belief was reasonable under the circumstances that plaintiff posed such a significant risk to them or others that deadly force was justified. *Sova, supra*. Unlike many excessive force cases, the jury in this case will have the advantage of seeing an entire recording of the automobile chase and its violent aftermath, from which they can determine whether or not the officers' actions were reasonable or unreasonable under all the circumstances and the Fourth Amendment, *Sova, supra*.

These officers are not entitled to qualified immunity.

## V. SUBSTANTIVE DUE PROCESS CLAIM

All of plaintiff's claims are premised on the officers' use of excessive force. As a result, her claims must be analyzed under the Fourth Amendment, not the substantive due process clause of the Fourteenth Amendment, *Graham v. Connor*, 490 U.S. 386, 395 (1989).

## VI. STATE LAW CLAIMS

There are disputed facts in the record, and inferences from facts, from which the jury could conclude that these officers' actions constituted assault and battery, and outrageous conduct.

## VII. MISCELLANEOUS

Andy Dossett claims in his affidavit that to his knowledge, none of the bullets he fired that night struck the plaintiff. The plaintiff in her affidavit says that she saw only Andy Dossett shoot at her, and does not recall seeing Ben Dossett. For his part, Ben Dossett claims in his affidavit that he did aim at, and hit, the plaintiff.

Notwithstanding that Ben Dossett acknowledges that he shot the plaintiff, that is insufficient to warrant the dismissal of Andy Dossett from this suit. For one thing, his statement is far less than an unequivocal assertion that none of his shots struck the plaintiff. For another, the jury could conclude that Andy Dossett and Ben Dossett were acting in concert, and the actions of one were effectively the actions of the other, as far as the shootings are concerned.

This the 21st day of October, 2011.

_____s/ Dennis H. Inman_____
United States Magistrate Judge
